**Electronically Filed
Intermediate Court of Appeals
CAAP-19-0000326
18-FEB-2022
07:55 AM
Dkt. 71 MO**

NO. CAAP-19-0000326

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

STATE OF HAWAIʻI, Plaintiff-Appellant, v.
GILBERT BALAI, SR., Defendant-Appellee

APPEAL FROM THE CIRCUIT COURT OF THE FIFTH CIRCUIT
(CASE NO. 5CPC-18-0000038)

MEMORANDUM OPINION
(By: Ginoza, C.J., and Wadsworth, J.,
and McCullen, J., dissenting)

On February 13, 2018, Defendant-Appellee Gilbert Balai, Sr. (**Balai**) was charged by Felony Information with Assault in the Second Degree, in violation of Hawaii Revised Statutes (**HRS**) § 707-711(1)(d) (2014 & Supp. 2016).[1] Prior to his arrest, Balai made incriminating statements in the presence of Kauaʻi Police Department (**KPD**) police officers, who were investigating a

---

[1] HRS § 707-711 provides, in relevant part:

> **Assault in the second degree.** (1) A person commits the offense of assault in the second degree if:
>
> . . . .
>
> (d) The person intentionally or knowingly causes bodily injury to another with a dangerous instrument[.]

HRS § 707-700 (2014) defines "[d]angerous instrument" for purposes of Chapter 707 to mean "any firearm . . . or other weapon, device, instrument, material, or substance, whether animate or inanimate, which in the manner it is used or is intended to be used is known to be capable of producing death or serious bodily injury."

reported assault.  The Circuit Court of the Fifth Circuit[2/] suppressed all of the statements made by Balai.

Plaintiff-Appellant State of Hawaiʻi (**State**) appeals from the "Order Determining That All Statements [Balai] Made to the [KPD] Were Not Voluntarily Made and Are Excluded from Use at Trial" (**Voluntariness Order**), entered on April 4, 2019, in the Circuit Court.  On appeal, the State contends that the Circuit Court erred in suppressing some of the statements Balai made while in the presence of KPD police officers, because those statements were not the product of custodial interrogation.[3/]

For the reasons explained below, we affirm the Voluntariness Order and remand the case to the Circuit Court for further proceedings.

## I.  Background

On May 30, 2018, the State filed a motion to determine the voluntariness of the statements Balai made to the police (**Voluntariness Motion)** in the course of the KPD's investigation. The Deputy Prosecuting Attorney (**DPA**) asserted in an attached declaration (**DPA Declaration**) that statements made by Balai to KPD Officer Kristopher Breyer (**Officer Breyer**) on or about February 11, 2018, "were made voluntarily and spontaneously, and not as a result of custodial interrogation."  The Voluntariness Motion was based on the DPA Declaration, a supporting memorandum, "and the records and files of this case."

The Voluntariness Motion was heard on March 18, 2019 (**Voluntariness Hearing).**  At that time, Officer Breyer testified as follows:  At approximately 12:40 a.m. on February 11, 2018,

---

[2/]     The Honorable Kathleen N.A. Watanabe presided.

[3/]     In the notice of appeal, the State also appealed from the Circuit Court's April 4, 2019 "Order Denying State's Motion for Findings of Fact, Conclusions of Law and Order Concerning Denial of State's Motion to Determine Voluntariness of the Statements Defendant Made to the Police Heard on March 18, 2019."  However, the State's opening brief includes no point of error or argument regarding this April 4, 2019 order, and the State's reply brief confirms that "[t]he State has not asserted a point of error concerning the trial court failure to enter findings of fact and conclusions of law to correspond to its suppression order." (Underscoring omitted.)  Any such issue is thus deemed waived.  See Hawaiʻi Rules of Appellate Procedure Rule 28(b)(4).

2

Officer Breyer was assigned to patrol in the Kapaʻa district and responded to a dispatch call involving an alleged assault at 310 Apana Road in Wailua (**310 Apana Road**).  The dispatch call indicated an assault involving a knife, and Officer Breyer "knew the two names . . . of the involved parties[,]" including that "[Balai's] name was provided on the way to the call" as an involved party.

Officer Breyer was wearing a body-worn camera as he responded to the dispatch call.  The resulting audio-visual recording (**Body Cam Video**) was entered into evidence and played during Officer Breyer's testimony at the Voluntariness Hearing.

Officer Breyer testified that on his way to the scene, he came across Dominic Barretto (**Barretto**), who "looked injured in his stomach area" and had "blood on him[.]"  The Body Cam Video showed Officer Breyer and another KPD officer, in a separate KPD vehicle, briefly interact with Barretto before continuing to 310 Apana Road.  Officer Breyer asked Barretto, "You . . . Gilbert?" to which a voice replies, "Dominic, Dominic," before Officer Breyer then tells Barretto to "Hang tight Dominic."  The State also asserts in its opening brief that "[Officer] Breyer heard Dominic say that Gilbert was at the residence with a knife."

The Body Cam Video then showed Officer Breyer and the other KPD officer briefly exit their vehicles along the road near where they encountered Barretto, and quickly look around.  Officer Breyer is heard to say, "gotta find the knife."  The KPD officers are then shown driving a short distance to 310 Apana Road.  Upon entering the 310 Apana Road property, Officer Breyer is heard asking various individuals where "Gilbert" is, and eventually finds Balai in the backyard working on a fence.

During his testimony, Officer Breyer explained:

> [DEFENSE COUNSEL:]  You're directed to the back of the -- you ask, "Where's -- where's Mr. Balai?" and you're directed to the back, correct?  Gilbert.  Where's Gilbert?  You go to the back, right?
>
> [OFFICER BREYER:]  That's correct.

Officer Breyer testified that he approached and made contact with Balai in the backyard near a fence line. When Officer Breyer first encountered Balai, he was "already named as a person of interest in this[.]"

The Body Cam Video showed that as Officer Breyer first approached Balai in the backyard, the officer called out, "Hey, Gilbert, . . . Kauaʻi Police." As Officer Breyer came closer to Balai, a knife was visible, sticking upright in the ground a few feet from Balai. Officer Breyer then said, "Gilbert, you can turn and face me." Balai responded, but continued to work on the fence.

Officer Breyer then said, "OK, so, we just got called here. We gotta figure out what's going on, OK?" Balai responded, "Nothing is going on," followed by other statements, while pausing from his work on the fence. Officer Breyer then asked Balai, "can you come sit down at the [nearby] table for me and we can talk story a little bit about this," but Balai responded with something about continuing to work on the fence. Officer Breyer replied, "Okay, you tie 'em [the fencing] down. You tie 'em down." Balai then resumed his efforts on the fence, while Officer Breyer remained at a distance watching. During the time that Balai continued working on the fence, he also continued talking.

Upon finishing his work on the fence, Balai immediately said to Officer Breyer, "Grab my knife, come over there," as Balai pointed first toward the knife sticking upright in the ground and then to a nearby table. Balai then walked toward the table. When Balai repeated, "Grab my knife," Officer Breyer responded in part, "come grab a seat, we'll grab 'em," and fell in behind Balai walking to the table. As they approached the table and Balai took a step away, Officer Breyer again said, "come grab a seat," and placed his right hand across Balai's back to Balai's right shoulder to keep Balai moving forward toward the table. During the time that Officer Breyer escorted Balai to the table, at least one other KPD officer was visible near the table. Balai then sat at the table.

Regarding the encounter, Officer Breyer testified:

[DEFENSE COUNSEL:]  Okay.  So you let him work on the fence a little bit more, and then -- and then you bring him over to the table and you have him sit down, correct?

[OFFICER BREYER:]  That's correct.

Q.  And at that point, he's not free to go, correct?

A.  At that time, he's in investigative detainment.

Q.  My question is extremely specific.  Was he free to go, yes or no?

A.  He was not free to leave the area at that point.

Q.  Okay.  Good.  So -- and the reason why we know he was not free to go is you -- not only do you have him sit down, you place him in handcuffs, correct?

A.  That's correct.

Q.  Okay. And -- and we can see -- and I'm not going to belabor the point, but we can see you do attempt to call -- first initially Mirandize him, right?

A.  That's correct.

Q.  And the reason why you Mirandize him is because he is a suspect in this case, correct?

A.  That's correct.

Q.  And he's not free to go, correct?

A.  That's correct.

Q.  He's in custody for all intents and purposes?  You may call it a detainment, but he's being detained, he's in custody?

A.  He's in investigative detainment.

The Body Cam Video showed that Balai, once seated at the table, began talking.  Officer Breyer repeatedly attempted, without success, to advise Balai of his rights, Balai continued to talk, and Officer Breyer allowed him to do so.  Balai's statements appear to include an account of what happened between him and Barretto.  At one point during a pause, Officer Breyer asked Balai if he was "calm," to which Balai responded, "Yeah, I tell you what happened."  Balai then continued talking.  After Balai stopped talking, Officer Breyer said to Balai, "Gilbert, so what I'm gonna do right now is, cause I don't know what's going on, I'm gonna put some handcuffs on you, okay?  This is just until I can figure out what's happening, alright?"  Officer

Breyer then handcuffed Balai.

At the conclusion of the Voluntariness Hearing, the Circuit Court ruled as follows:

> THE COURT: . . . . Based on the Court's review of the body cam video, based on your respective arguments, the Court is in agreement with the defense. The statements were certainly tainted.
>
> I want to state on the record that the officer had ample opportunity to Mirandize the defendant. Granted, the defendant made it difficult at the first get-go, but on the second review of the video, what became very apparent was from the time that the handcuffs were placed on Mr. Balai up until the time the Miranda warnings were actually given, as [defense counsel] pointed out, we're talking about four minutes passed. And Mr. Balai was speaking. He was not speaking in an agitated voice. He was -- there was many opportunities for the officer to give the Miranda warnings even at that point. There's even a second officer on the video who was asking something at one point.
>
> You know, frankly, it's a situation from the get-go -- when Mr. Balai was first approached, he was pretty much allowed to do whatever he wanted to do. First he's allowed to finish working on the fence that he's -- I guess the hog wire that he's trying to tie, and then he's allowed to sit down. He's allowed to just ramble on and on and on.
>
> As I said, I understand the difficulties the officer had in trying to Mirandize the first time, but basically the officer gave up and allowed Mr. Balai to ramble and then later on, you know, missed many opportunities or let a lot of opportunities pass when he could have properly Mirandized Mr. Balai.
>
> I know that the State wants to break it down into like parts and wants to basically justify how each part would work independently or separate. The Court finds that it's all tainted, so the statements are out.
>
> . . . .
>
> THE COURT: . . . . You know, what I'm saying basically is that before Mr. Balai continued to say anything more, he should have been Mirandized . . . at the outset.
>
> [DPA]: At the outset.
>
> Now, but regarding when the officer first arrived on scene, he talked to Mr. Balai and they said, "Oh, let's go sit down." He let Mr. Balai finish what he's doing. Mr. Balai says, "Oh, that's my -- forget my knife." That's considered tainted as well, your Honor?
>
> THE COURT: All of it. You know, as I said, the officer had ample opportunity to Mirandize Mr. Balai from the very outset, when he first approached Mr. -- Mr. Balai. Mr. Balai even answered on the -- on the video that he knew he was being detained.
>
> You know, basically you have the officer, you have other officers who are milling around. You know, you have

an officer telling Mr. Balai to have a seat, putting his hand on Mr. Balai.  Clearly Mr. Balai was being detained --

. . . .

THE COURT:  -- for questioning, and clearly, based on the officer's testimony, Mr. Balai was not free to get up and leave and refuse to answer the officer.

[DPA]:  And then -- sorry, your Honor.  And then just to clarify, and then the initial interactions with the defendant, when the officer just said, "I'm just here to figure out what's going on," and that -- so the Court considers that detainment and interrogation as well?

THE COURT:  When the officer says, "I'm just here to figure out what's going on," I mean, to me that's a clear message to the defendant that's why I'm here; I'm here to talk to you.  So clearly warnings should have been given at the outset.

. . . .

THE COURT:  And clearly Mr. Balai should not have been allowed to just say what he wants, and, you know, the officer should not have just given up. . . .  So it's -- all of the statements are out.

The Voluntariness Order was filed on April 4, 2019, and this appeal followed.

## II.  Points of Error

In its opening brief, the State raised four points of error, contending that the Circuit Court erred:  (1) in concluding that Officer Breyer should have Mirandized Balai when the officer first encountered Balai in the backyard; (2) in concluding that Balai's statements made before he said to Officer Breyer, "Grab my knife," as well as Balai's statement, "Grab my knife," were illegally obtained; (3) in concluding that Balai's statements made to Officer Breyer while Balai was seated at the table, before <u>Miranda</u> warnings were given, were illegally obtained; and (4) in suppressing Balai's statements made before he was placed in handcuffs.  In essence, the State contended that all of Balai's statements, made from the time that Officer Breyer first encountered him in the backyard until Balai was placed in handcuffs, were not the product of custodial interrogation and thus should not have been suppressed.

However, in its reply brief, the State clarified that "The State is <u>not</u> seeking to overturn the [Voluntariness Order] as to the suppression of [Balai's] statements made <u>after</u> he told

7

[Officer] Breyer to grab his knife." Thus, the State appears to have abandoned its third point of error, as well as its fourth point of error to the extent the State originally challenged the suppression of Balai's statements made after he told Officer Breyer to grab the knife. Additionally, the State's first point of error is substantially related to, if not subsumed within, its second point of error.

Accordingly, we consider whether the Circuit Court erred in suppressing the statements Balai made before he told Officer Breyer, "Grab my knife," as well as Balai's statement, "Grab my knife," based on the court's conclusions that these statements were the product of custodial interrogation and that Balai should have been Mirandized when Officer Breyer first approached Balai in the backyard.[4/]

### III. Discussion

In State v. Uchima, 147 Hawaiʻi 64, 464 P.3d 852 (2020), the Hawaiʻi Supreme Court reiterated:

> Under the Fifth Amendment to the United States Constitution and article I, section 10 of the Hawaiʻi Constitution, a person in a criminal case cannot be compelled to be a witness against oneself. This court has long held that article I, section 10 of the Hawaiʻi Constitution provides an independent source for the protections which the United States Supreme Court enumerated in Miranda. State v. Kazanas, 138 Hawaiʻi 23, 34, 375 P.3d 1261, 1272 (2016); see State v. Santiago, 53 Haw. 254, 265-66, 492 P.2d 657, 664 (1971). Thus, as a matter of state constitutional law, statements stemming from custodial interrogation may not be used by the State unless it "first demonstrate[s] the use of procedural safeguards effective to secure the privilege against self-incrimination." Kazanas, 138 Hawaiʻi at 34, 375 P.3d at 1272 (quoting State v. Ikaika, 67 Haw. 563, 566, 698 P.2d 281, 283-84 (1985)).

Id. at 84, 464 P.3d at 872.

---

[4/]  Although the Circuit Court did not use the words "custodial interrogation" in suppressing Balai's statements, in substance, that was the basis for the court's ruling, as reflected in the following excerpts: "[T]he officer had ample opportunity to Mirandize Mr. Balai from the very outset, when he first approached . . . Mr. Balai. . . . Clearly Mr. Balai was being detained . . . for questioning, and clearly, based on the officer's testimony, Mr. Balai was not free to get up and leave and refuse to answer the officer. . . . When the officer says, "I'm just here to figure out what's going on," I mean, to me that's a clear message to the defendant that's why I'm here; I'm here to talk to you. So clearly warnings should have been given at the outset. . . . So it's – all of the statements are out." (Formatting altered.)

"A critical safeguard is the Miranda warning: an accused must be warned that he or she had a right to remain silent, that anything said could be used against him or her, that he or she had a right to the presence of an attorney, and that if he or she could not afford an attorney one would be appointed for him or her." Kazanas, 138 Hawaiʻi at 34, 375 P.3d at 1272 (internal quotation marks omitted) (quoting State v. Ketchum, 97 Hawaiʻi 107, 116, 34 P.3d 1006, 1015 (2001)); see State v. Patterson, 59 Haw. 357, 358-59, 581 P.2d 752, 753 (1978) ("An individual in police custody may not be subjected to interrogation without first being advised of his Miranda rights." (underscoring added) (citing State v. Kalai, 56 Haw. 366, 537 P.2d 8 (1975))). If Miranda's safeguards are not satisfied, then the accused's statements stemming from custodial interrogation may not be used either as direct evidence or to impeach the defendant's credibility. See State v. Hoey, 77 Hawaiʻi 17, 33, 881 P.2d 504, 520 (1994).

Miranda warnings must be given when a defendant is (1) in custody, and (2) under interrogation. State v. Ah Loo, 94 Hawaiʻi 207, 210, 10 P.3d 728, 731 (2000); see Uchima, 147 Hawaiʻi at 84, 464 P.3d at 872. "Custodial interrogation for Miranda purposes means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Patterson, 59 Haw. at 357, 581 P.2d at 752-753.

To determine whether an interrogation was custodial, the court looks "to the totality of the circumstances, focusing on the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and any other relevant circumstances." Ah Loo, 94 Hawaiʻi at 210, 10 P.3d at 731 (internal quotation marks and brackets omitted) (quoting State v. Melemai, 64 Haw. 479, 481, 643 P.2d 541, 544 (1982)); see State v. Wyatt, 67 Haw. 293, 299, 687 P.2d 544, 549 (1984) ("Whether interrogation was carried on in a custodial context is dependent on the totality of circumstances surrounding the questioning. The relevant circumstances, we have said, include 'the time, place and length

9

of the interrogation, the nature of the questions asked, [and] the conduct of the police at the time of the interrogation.'" (first citing State v. Paahana, 66 Haw. 499, 503, 666 P.2d 592, 595 (1983), and Melemai, 64 Haw. at 481, 643 P.2d at 544, then quoting Paahana, 66 Haw. at 503, 666 P.2d at 595)). In this regard, the supreme court has acknowledged that "'no precise line can be drawn' between 'custodial interrogation,' on the one hand, and 'permissible general on-the-scene questioning,' on the other." Ah Loo, 94 Hawaiʻi at 210, 10 P.3d at 731 (brackets omitted) (quoting Patterson, 59 Haw. at 362, 581 P.2d at 755-56). The totality of the circumstances test applies to custodial interrogation, "in the sense that the defendant is deprived of his or her freedom of action in any significant way." Kazanas, 138 Hawaiʻi at,35, 375 P.3d at 1273. Relevant circumstances can include "whether the investigation has focused on the suspect and whether the police have probable cause to arrest [the suspect] prior to questioning[.]" Ah Loo, 94 Hawaiʻi at 210, 10 P.3d at 731 (quoting Melemai, 64 Haw. at 481, 643 P.2d at 544).

In contrast, "the touchstone in analyzing whether 'interrogation' has taken place is whether the police officer 'should have known that his or her words and actions were reasonably likely to elicit an incriminating response from the defendant.'" Kazanas, 138 Hawaiʻi at 38, 375 P.3d at 1276 (brackets omitted) (quoting Paahana, 66 Haw. at 503, 666 P.2d at 595-596). "[I]nterrogation encompasses not only express questioning, but also any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Uchima, 147 Hawaiʻi at 84, 464 P.3d at 872 (quoting State v. Trinque, 140 Hawaiʻi 269, 277, 400 P.3d 470, 478 (2017)). A police officer's subjective intent "is not determinative in analyzing whether his [or her] words and conduct amounted to interrogation." Trinque, 140 Hawaiʻi at 278, 400 P.3d at 479 (citing State v. Joseph, 109 Hawaiʻi 482, 495, 128 P.3d 795, 808 (2006)).

Here, Officer Breyer sought out Balai in his backyard after midnight in connection with a reported assault. Before

approaching Balai, Officer Breyer already knew there was a report of an assault with a knife, knew the names of the two individuals (Dominic and Gilbert) involved in the incident, and knew that Dominic had been injured and was bleeding in his stomach area. The State also asserts that Officer Breyer heard Dominic say that Gilbert was at the residence with a knife. Officer Breyer then stated, "gotta find the knife," and continued to the residence with another officer. Upon arrival, Officer Breyer asked various individuals where "Gilbert" was, and was directed to the backyard. When Officer Breyer walked into the backyard looking for Gilbert, he approached a man working on a fence, and saw a knife sticking upright in the ground a few feet from the man. Officer Breyer addressed the man as "Gilbert," and Balai appeared to respond as such. Officer Breyer then said, "Ok, so we just got called here. We gotta figure out what's going on, Okay?" Based on all of the relevant circumstances, we conclude that the police, upon discovering Balai and the knife in the backyard, at a minimum had focused their investigation on Balai. See Ah Loo, 94 Hawaiʻi at 210, 10 P.3d at 731; Patterson, 59 Haw. at 361, 581 P.2d at 755 (focus of the investigation upon the defendant is "an important factor in the determination of whether the defendant was subjected to custodial interrogation" (citing Kalai, 56 Haw. at 369, 537 P.2d at 11)).

We further conclude that under all of the relevant circumstances, when the police discovered Balai and the knife in the backyard, Balai was "deprived of his . . . freedom of action in [a] significant way." Kazanas, 138 Hawaiʻi at 35, 375 P.3d at 1273. At that point, the hour was late and Balai was in the presence of at least two KPD police officers. Officer Breyer already knew the above-described information and had observed a knife just a few feet away from Balai. Thus, the police were aware of solid evidence linking Balai to the reported assault. See State v. Russo, 67 Haw. 126, 136, 681 P.2d 553, 561 (1984). It would have been unreasonable for Balai to think he could have ushered the police out of the backyard; nor were they about to leave, given that they had just located Balai and the possible weapon used in the reported assault. See id. Since Balai could

not have had a reasonable belief that he was "free to go," we conclude he was "deprived of his freedom of action in a significant way."[5] Id. (ellipsis and brackets omitted) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)); Kazanas, 138 Hawaiʻi at 35, 375 P.3d at 1273.

Under the totality of the circumstances in this case, Balai was in custody from the time that Officer Breyer discovered Balai and the knife in the backyard. Moreover, in this context, we conclude that Officer Breyer's statement to Balai -- "Ok, so we just got called here. We gotta figure out what's going on, Okay?" -- was reasonably likely to elicit an incriminating response and, therefore, constituted interrogation. See Kazanas, 138 Hawaiʻi at 38, 375 P.3d at 1276. Based on Officer Breyer's words and conduct, it appears he was attempting to gain Balai's trust so that Balai would talk about the stabbing incident.

Accordingly, the statements at issue in this appeal, all of which were made by Balai after Officer Breyer's above-quoted statement,[6] were the product of pre-Miranda custodial interrogation, and the Circuit Court did not err in suppressing Balai's statements.

---

[5] Indeed, the State argues in its opening brief that "this court should conclude that when [Officer] Breyer encountered [Balai] in the backyard, he possessed a reasonable suspicion that he was the 'Gilbert' who recently stabbed Dominic." The State further argues, however, that "although a knife was partially buried in the ground a few feet from where [Balai] was standing, . . . [Balai] did not appear bloody or injured. So, [Officer] Breyer did not have probable cause to conclude that [Balai] had recently stabbed Dominic." The State fails to adequately explain its reasoning. Moreover, in these circumstances, where Balai was the focus of investigation and deprived of his freedom of action in a significant way, we need not decide whether Officer Breyer also had probable cause to arrest Balai when the officer first observed the knife. See Melemai, 64 Haw. at 481, 643 P.2d at 544 (probable cause to arrest may play a significant role in the application of the Miranda rule, but it is "not determinative").

[6] The State clarifies in its reply brief:

[Officer] Breyer's Body Worn Camera footage clearly indicates that [Balai], while standing about 10-15 feet from [Officer] Breyer, was actively working on the fencing material when [Officer] Breyer asked him, "*So, we just got called here. We gotta figure out what's going on, OK?*" After that, Balai made incriminating statements and directed [Officer] Breyer to grab his ([Balai's]) knife, and [Officer] Breyer escorted [Balai] over to a nearby outdoor table.

(Italics and underscoring in original.)

## IV.  Conclusion

For the reasons discussed above, we affirm the April 4, 2019 "Order Determining That All Statements Defendant Made to the Kauai Police Department Were Not Voluntarily Made and Are Excluded from Use at Trial," entered in the Circuit Court of the Fifth Circuit.  The case is remanded to the Circuit Court for further proceedings.

DATED:  Honolulu, Hawaiʻi, February 18, 2022.


On the briefs:

Tracy Murakami,
Deputy Prosecuting Attorney,
County of Kauaʻi,
for Plaintiff-Appellant.

Daniel G. Hempey
(De Costa Hempey LLC)
for Defendant-Appellee.

/s/ Lisa M. Ginoza
Chief Judge


/s/ Clyde J. Wadsworth
Associate Judge

DISSENTING OPINION BY MCCULLEN, J.

I respectfully dissent.  Defendant-Appellee Gilbert Balai (**Gilbert**) was not in custody and was not interrogated during the first minute and twenty-five seconds of his encounter with the officer, which is the subject of this appeal.

Custodial interrogation generally requires the suspect to be (1) in custody and (2) interrogated.  State v. Kazanas, 138 Hawaiʻi 23, 35, 375 P.3d 1261, 1273 (2016).  The Hawaiʻi Supreme Court recognized the distinction between custodial interrogation subject to Miranda warnings and "permissible general on-the-scene questioning."  State v. Ah Loo, 94 Hawaiʻi 207, 210, 10 P.3d 728, 731 (2000).  Although the court observed that the line between the two is imprecise, if "neither probable cause to arrest nor sustained and coercive interrogation are present, then questions posed by the police do not rise to the level of 'custodial interrogation' requiring Miranda warnings."  Id. at 94 Hawaiʻi at 210, 10 P.3d at 731.

As the court explained, a person may be seized, yet not in custody:

> [A]n individual may very well be "seized," within the meaning of article I, section 7 of the Hawaiʻi Constitution (inasmuch as, "given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave," [State v. Trainor, 83 Hawaiʻi 250, 256, 925 P.2d 818, 824 (1996)]), and yet not be "in custody," such that *Miranda* warnings are required as a precondition to any questioning.

Id. at 211, 10 P.3d at 732.  The court further observed that the purpose of an investigatory stop is to confirm or deny an officer's suspicions with reasonable questioning:

> [a]n officer making an investigatory stop will often have some suspicion of the identity of the person apprehended and of his prior unobserved activity. *It is the very purpose of the investigatory stop to allow the officer to confirm or deny these suspicions by reasonable questioning, rather than forcing in each instance the 'all or nothing' choice between arrest and inaction.*

State v. Patterson, 59 Haw. 357, 363–64, 581 P.2d 752, 756 (1978) (citing United States v. Hickman, 523 F.2d 323, 327 (9th Cir. 1975)) (emphasis added).

Therefore, our courts have contemplated instances where a person's freedom of movement may be restricted and that person may be questioned to confirm or deny a police officer's reasonable suspicion. Id. That is what occurred during the first minute and twenty-five seconds of Gilbert's encounter with Kauaʻi Police Department Officer Kristopher Breyer **(Officer Breyer)**.

### Custody

To determine whether a suspect is in custody, courts look to the totality of the circumstances and focus on "the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and any other relevant circumstances." Ah Loo, 94 Hawaiʻi at 210, 10 P.3d at 731 (brackets removed). While the focus of an investigation on a suspect and probable cause are important factors, they are not dispositive in determining whether a custodial interrogation occurred. State v. Melemai, 64 Haw. 479, 481–82, 643 P.2d 541, 544 (1982). Instead, the inquiry focuses on the totality of the circumstances. See, e.g., Ah Loo, 94 Hawaiʻi at 210, 10 P.3d at 731).

First, Officer Breyer approached Gilbert in his backyard, and stood a fair distance away. Although Officer

15

Breyer testified that Gilbert was not free to leave because he was under "investigative detainment", Gilbert was given ample room to move around and latitude to continue fixing his fence. Second, the length of time between Officer Breyer's initial contact with Gilbert and Gilbert identifying the knife as his was approximately one minute and twenty-five seconds. Third, Officer Breyer did not ask Gilbert any questions but informed Gilbert of the reason he was on Gilbert's property. Fourth, Officer Breyer maintained a calm, respectful, and professional demeanor and did not display any coercive behavior. Finally, although the circumstances occurred late at night, the police had no choice but to respond at that time because that was when the assault call was made.

Based on these circumstances, Officer Breyer's interaction with Gilbert was not conducted under any coercive circumstance to warrant a finding that Gilbert was in custody for the first minute and twenty-five seconds. See State v. Hoffman, 73 Haw. 41, 53, 828 P.2d 805, 812 (1992) (stating that the setting where the police officer questioned the defendant was not custodial or of a nature likely to subjugate a defendant to the will of the officer); Patterson, 59 Haw. at 363–64, 581 P.2d at 756 (finding no custodial interrogation because the police interview of the burglary suspect was brief, comprised of fact-finding inquires designed to clarify the situation, lacked an overbearing show of force, and not conducted under coercive circumstances).

Also, there was no probable cause to arrest Gilbert during the first minute and twenty-five seconds. Probable cause

16

"exists when the facts and circumstances within one's knowledge and of which one has reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed. This requires more than a mere suspicion but less than a certainty." State v. Maganis, 109 Hawaiʻi 84, 86, 123 P.3d 679, 681 (2005) (citations, internal quotation marks, and emphasis omitted).

Here, Officer Breyer testified that he responded to a dispatch call involving an assault with a knife, and that "Gilbert" and "Dominic" were the parties involved. Officer Breyer's Body Cam Video showed him drive up to three males, one injured with blood, walking on the side of the road. Officer Breyer asked through the window, "[y]ou ah Gilbert?" to which the male responded, "Dominic, Dominic." Officer Breyer said, "hang tight Dominic," and drove further along the road. When Officer Breyer stopped again, he exited his car and pointed to some shrubbery and said, "we gotta find the knife, it's in here, it was in here?"

Officer Breyer returned to his car and drove to the property involved where four women and several children were in the front yard. Officer Breyer exited his car and asked for Gilbert. Although most of the conversation was unintelligible, he was eventually directed to the backyard with one woman clearly saying, "Gilbert is in the back I think . . . yeah I don't know . . . no I just saying I don't know if Uncle Gilbert is in the back or not."

Officer Breyer walked along some structures toward the backyard and, upon seeing a male fixing a fence, Officer Breyer

called out, "hey Gilbert, hey Kauaʻi Police, hey brah, Gilbert you can turn and face me."  The male whose attention was focused on the fence said, "I'm just strapping down, what I doing?"

At that point, there was no positive identification that the male fixing the fence was, in fact, Gilbert.  Although a positive identification of a suspect may be sufficient to establish probable cause, there was no express denial or acknowledgment by the male that he was in fact Gilbert, and there was no positive identification by Dominic or any other witness. See State v. Pulse, 83 Hawaiʻi 229, 245, 925 P.2d 797, 813 (1996), amended by 83 Hawaiʻi 545, 928 P.2d 39 (1996) (holding that a positive identification by the victim that the defendant terrorized him with a gun was sufficient to establish probable cause).

Furthermore, Gilbert was in the process of fixing a fence using some sort of tool, and there was no indication he was holding a knife.  Although the Body Cam Video shows a black object protruding from the ground near the roll of fencing, there was no testimony that Officer Breyer understood it to be a knife prior to Gilbert saying so.  And even if Officer Breyer understood the object to be a knife, mere proximity was insufficient to establish probable cause.  See Hoffman, 73 Haw. at 43, 54, 828 P.2d at 807, 813 (stating that a beer bottle that was in close proximity to the defendant combined with a witness' statement that the bottle belonged to the defendant was not sufficient to establish probable cause to arrest the defendant for unlawful display of intoxicating liquor).

Although the State asserts in its opening brief that "[Officer] Breyer heard Dominic say that Gilbert was at the residence with a knife," the State provided no citation for this assertion and this assertion was not evidence. See Alghussein v. Kaan, 149 Hawaiʻi 174, 184, 485 P.3d 68, 78 (App. 2021) (noting that an argument made by counsel in a memorandum of law is not evidence).

More importantly, the Body Cam Video shown and the testimony adduced at the voluntariness hearing did not support the assertion that Dominic told Officer Breyer that Gilbert was at home and possessed a knife. The Body Cam Video showed the male on the road say, "Dominic, Dominic" and Officer Breyer responded, "hang tight Dominic." When asked during cross-examination, "although you report--you say he--he told you certain things, the truth of the matter is all he said was Dominic and you tell him something to the effect of hang on . . . ," Officer Breyer responded, "That's correct."

Based on the evidence adduced at the voluntariness hearing, Officer Breyer knew there was an assault with a knife, Gilbert and Dominic were the parties involved, and an injured Dominic was walking along the road. And although he approached a male fixing a fence, Officer Breyer did not positively identify that male as Gilbert. It was not until Gilbert claimed ownership of the knife in the ground at approximately one minute and twenty-five seconds after Officer Breyer approached that the facts and circumstances within Officer Breyer's knowledge would warrant a person of reasonable caution to believe the male fixing the fence committed a crime, i.e., probable cause. Thus, based

19

on the totality of circumstances as shown by the evidence adduced, Gilbert was not in custody for the first minute and twenty-five seconds of his encounter with Officer Breyer.

### Interrogation

Gilbert was also not interrogated during that time. Interrogation "under <u>Miranda</u> refers to (1) any words, actions, or practice on the part of the police, not only express questioning, (2) other than those normally attendant to arrest and custody, and (3) that the police should know is reasonably likely to invoke an incriminating response." <u>State v. Trinque</u>, 140 Hawaiʻi 269, 277, 400 P.3d 470, 478 (2017). But, "[g]enerally, informing a defendant of the reason for being stopped or arrested does not constitute custodial interrogation likely to elicit an incriminating response." <u>State v. Sagapolutele-Silva</u>, 147 Hawaiʻi 92, 103, 464 P.3d 880, 891 (App. 2020), <u>cert. granted,</u> No. SCWC-19-0000491, 2020 WL 5544432 and 5544434 (Haw. Sept. 16, 2020).

Officer Breyer said, "hey Gilbert, hey Kauaʻi Police, hey brah, Gilbert you can turn and face me." He then said, "Ok, so we just got called here. We gotta figure out what's going on. Okay?" These statements were properly made to inform Gilbert as to why Officer Breyer was standing in the middle of his backyard during the middle of the night. See <u>Sagapolutele-Silva</u>, 147 Hawaiʻi at 103, 464 P.3d at 891 (stating that simply informing a person of the reasons for their stop or arrest does not constitute interrogation); <u>United States v. Crisco</u>, 725 F.2d 1228, 1232 (9th Cir. 1984) ("[W]hen an officer informs a [suspect] of [the] circumstances [of their arrest or explains

evidence against them] this information may be considered normally attendant to arrest and custody.").

Although the Kazanas court held that even "small talk" could amount to an interrogation, Kazanas is distinguishable. In Kazanas, the defendant was charged with criminal property damage and unauthorized entry into a motor vehicle. Kazanas, 138 Hawaiʻi at 27, 375 P.3d at 1265. After placing the defendant under arrest, the officer transported the defendant to the hospital and took him alone to the Honolulu Police Department's private hospital room. Id. at 28, 40-41, 375 P.3d at 1266, 1278-79. There, the officer asked the defendant how his Halloween went. Id. at 40-41, 375 P.3d at 1278-79. The defendant responded that if people did not upset him, he would not have had to punch them. Id. at 28, 375 P.3d at 1266.

The Hawaiʻi Supreme Court held that the officer's question about Halloween was an interrogation. Id. at 40-41, 375 P.3d at 1278-79. The court observed that the officer knew how the defendant's Halloween went because she encountered him at the end of his night and was aware of the circumstances of his arrest. Id. The court reasoned that finding there was no interrogation would "encourage police officers to engage suspects in custody in non-Mirandized and seemingly harmless conversations about 'how their night was going' in the hope that the suspects may make incriminating statements about the events leading up to their arrest." Id.

Unlike the officer in Kazanas, Officer Breyer did not encounter Gilbert at the end of the investigation with full knowledge of the events that transpired. Instead, Officer Breyer

was the first to contact Gilbert with general knowledge of an assault with a knife, the names "Gilbert" and "Dominic," and that an injured Dominic was walking along the road. Officer Breyer did not know the circumstances of the assault and had not positively identified Gilbert.

Nothing in that first minute and twenty-five seconds indicated that Officer Breyer attempted to elicit an incriminating response. Instead, Officer Breyer informed Gilbert that he was on his property as part of an investigatory stop. Concluding otherwise would force officers in similar circumstances to take the impractical and disfavored "all or nothing" approach between arrest or inaction. See Patterson, 59 Haw. at 363-64, 581 P.2d at 756.

## Conclusion

Based on the evidence adduced during the voluntariness hearing, Gilbert was not subjected to custodial interrogation during the first minute and twenty-five seconds of his contact with Officer Breyer under the totality of the circumstances; "neither probable cause to arrest nor sustained and coercive interrogation" were present. Ah Loo, 94 Hawaiʻi at 210-211, 10 P.3d at 731-32. I would, thus, hold that the Circuit Court erroneously suppressed Gilbert's statements made up to and including "[g]rab my knife."

/s/ Sonja M.P. McCullen
Associate Judge

22